## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PATRICIA HALLBERG** | **CIVIL ACTION NO.: 05-0630** |
| **VERSUS** | **DIVISION "K"** |
| **PENDLETON MEMORIAL METHODIST HOSPITAL** | **JUDGE STANWOOD DUVAL** |
| **and** | **MAGISTRATE 5** |
| **PATRICK BRADY** | **MAGISTRATE ALMA L. CHASEZ** |

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

EDWARD F. HAROLD, T.A.
Louisiana Bar No. 21672
A. KEVIN TROUTMAN
Louisiana Bar No. 27668
FISHER & PHILLIPS LLP
201 St. Charles Avenue
Suite 3710
New Orleans, LA 70170
Telephone: (504) 522-3303
Telecopy:  (504) 529-3850

ATTORNEYS FOR DEFENDANTS
PENDLETON MEMORIAL METHODIST
HOSPITAL AND PATRICK BRADY

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiff Patricia Hallberg brings this suit against her former employer, Pendleton

Memorial Methodist Hospital ("Pendleton") and a co-worker, Patrick Brady ("Brady"). She

claims she was terminated either for making a complaint about sexual harassment or for having a

disability or in retaliation for using FMLA leave. She also claims she suffered sexual harassment,

retaliatory harassment for making complaints about sexual harassment and was improperly

denied FMLA leave.

Plaintiff has no evidence to support any of these excuses for her poor performance that

resulted in her termination. Rather, this is a case of an ex-employee throwing spaghetti at the

wall in an attempt to see if anything sticks. Plaintiff's own deposition testimony wholly

undercuts her claims. It shows that she has no evidence whatsoever to establish Pendleton's

reason for terminating her employment is pretext for any of the forms of discrimination alleged.

Likewise, it establishes that none of the attendant claims of harassment or denial of leave have

any merit. As such, Defendants request this Court dismiss Plaintiff's claims in their entirety.

## II.   PLAINTIFF HAS NO EVIDENCE SUGGESTING PENDLETON'S LEGITIMATE REASON FOR TERMINATING HER IS PRETEXT

### A.   FACTS: PLAINTIFF'S EMPLOYMENT AND TERMINATION[1]

1.   Plaintiff's Employment History

Plaintiff is a registered nurse who began working for Pendleton on or about December

10, 2001, and became an instructor in the Hospital's education department in March, 2002.  D. at

---

[1] Defendants are accepting the facts herein solely for the purpose of this motion and are not admitting them for any other purpose. Moreover, Defendants are not herein exhaustively asserting all their defenses to Plaintiff's claims and the failure to challenge  the existence of an element of a claim or assert a defense to it is not intended to waive or otherwise limit their defenses.

80.[2]  In this position, she reported to Loree Doyle, Defendant's then Education Manager. D. at 84, 127.  Patrick Brady, also a registered nurse, was her co-worker. His primary responsibility was planning and coordinating health education programs for the public.[3] D. at 116-17. As of April, 2003, it appeared that Plaintiff was doing a good job after her first year in the department. D. at 84; Exhibit 3.

On June 9, 2003, Plaintiff received the first in a series of disciplinary actions and her overall job performance began deteriorating. This first action resulted from Plaintiff's confrontational behavior toward two nurses who had attended a CPR class that she had taught. D. at 93, 130; Exhibit 7. Plaintiff observed the two nurses in the Human Resources office. Apparently assuming (incorrectly) that the nurses were there complaining about Plaintiff's earlier conduct toward them, Plaintiff stormed in and berated them in front of other Pendleton employees. Doyle Dec. at 14, Exhibit 1. When the nurses refused to quarrel with her, Plaintiff threatened to pull their attendance records, which had nothing to do with her job, and look for problems that could be used against them. She then slammed the door in their faces and thundered out of the office. *Id*. Doyle disciplined Plaintiff, based upon first-hand reports of this incident from human resources employees Nichelle Thomas and Kim Myers. D. at 93, 130; Exhibit 7.

Plaintiff had other unpleasant interactions with Hospital employees. Plaintiff's supervisors received information from several other employees reporting that Plaintiff had

---

[2]Plaintiff's deposition references and Exhibits to the Deposition are attached *in globo* as Exhibit A.  Hereinafter all references will be to " D. (page no.)." Likewise, the Declarations of Katherine Bertolino, Debbie Skevington and Loree Doyle have been attached as Exhibits B – D respectively.

[3]Plaintiff may contend that Brady was her supervisor. However, it is undisputed that he did not sign Plaintiff's performance evaluations, ever discipline her or grant her a pay raise or terminate her. D. at 84, 131-34.  Further, she never presented any grievances or similar concerns to him.  D. at 140.  Also, the record shows that Plaintiff and Brady assisted each other in their respective duties.  D. at 117.

engaged in rude or otherwise inappropriate conduct. Though Plaintiff denied culpability in any of these occurrences, these reports were among the reasons for her termination. D. 130, 143-46.

After Doyle left the Hospital to accept another position, Debbie Skevington became Plaintiff's supervisor. On September 15, 2003, she issued Plaintiff another disciplinary action. D. at 94-95; Exhibit 8. The basis for this action was excessive unscheduled absenteeism (six occurrences in four months) pursuant to the standards set forth in Pendleton's no-fault attendance policy.[4] D. at 95-96, 104-106; Exhibits 9, 10. This action included a warning that further violations could lead to termination under the Hospital's progressive discipline policy.  D. Exhibit 8.  For the purposes of this policy, the Hospital counted an unscheduled absence as one "occurrence," regardless of how many days the employee missed. Skevington Dec. at 6.  FMLA-covered absences did not count for purposes of assessing an employee's attendance pursuant to Pendleton's no-fault policy. Bertolino Dec. at 4.

The disciplinary action was based upon unscheduled absences that occurred on May 6 and 29, June 5-6 and 30, July 15 and August 10. The documented reasons for the unscheduled absences underlying the September 15 disciplinary action included "pain" in Plaintiff's neck and/or back, a death in the family and bad weather. D. at 98, 102-03; Exhibit 8.  Plaintiff attributed some of the six occurrences generally to being "sick" or "ill." D. Exhibit 8.

        2.    <u>The Events Giving Rise to Plaintiff's Termination</u>

In early November, Plaintiff was coordinating the presentation of an Advanced Cardiac Life Support (ACLS) course. This was a very important program not only because it provided training in fundamental life-saving skills for the Hospital's clinical (patient care) staff, but the course was also subject to accreditation standards established by the American Heart

---

[4]The Hospital's policy provided that absences related to certified FMLA leave were not considered in determining

Association; was part of Pendleton's formal nurse's CE (continuing education) program; and was the department's first such program presented without Doyle. D at 158, 165; Skevington Dec. at 7.  Following the class, Skevington became aware of several related errors, complaints and other problems involving Plaintiff that occurred during this period. Participants in the ACLS course complained about Plaintiff's rudeness during the course. They also reported to Skevington that Plaintiff made unfounded, critical remarks to the participants about another employee who helped present the course. Further, Plaintiff had not prepared properly to put on this important program and committed several clerical errors. As a result, work had to be done at the last minute, documentation was lacking, some participants missed sections (or stations) of the program and teaching responsibilities were not properly covered. Skevington Dec. at 7-8, Exhibit 1. These concerns were significant enough for Skevington to seek Bertolino's help in addressing them.  Bertolino Dec. at 8; Skevington Dec. at 7.

Bertolino and Skevington reviewed Plaintiff's performance in and around the time that she was responsible for coordinating the ACLS course. They concluded there had been a number of problems and shortcomings in her job performance. Bertolino Dec. at 9, Exhibit 1; Skevington Dec. at 8, Exhibit 1. These problems included:

Plaintiff failed to attend an in-service education program on October 17;[5]

multiple errors and/or deficiencies in Plaintiff's preparation for the ACLS course;

inappropriate conduct and comments during the ACLS course;

improperly rushing some of the participants through their sessions.

Skevington Dec. at 7-8, Exhibit 1.

---

whether an employee had violated this policy.  D. at 96.
[5]This incident did not relate directly to the ACLS course, but was indicative of Plaintiff's increasing carelessness.

After identifying these concerns and reviewing Plaintiff's emerging pattern of infractions, (two prior disciplinary actions in a 120 day period) Bertolino and Skevington decided to terminate her.[6] On November 11, 2003, they prepared and signed a form to terminate Plaintiff in anticipation of meeting with her to advise her of her termination. Bertolino Dec. 10-11, Exhibit 2; Skevington Dec. at 9, 11, Exhibit 2.

At approximately 11:30 on the morning of November 11, Bertolino and Skevington convened a meeting with Plaintiff to advise her she was being terminated and provide her the opportunity to resign. Before Bertolino and Skevington finished discussing the matter with Plaintiff, she got up and walked out of the meeting.  Plaintiff admitted she had been fired during this meeting, a perception that she expressed to others in her department before leaving the premises. Plaintiff's meeting with Bertolino and Skevington ended at approximately noon on November 11.  D. at 145-46, 273.

### 3.   Plaintiff's Complaint Of Inappropriate Conduct By Her Co-Worker Brady

On August 23, 2002, more than a year prior to her termination Plaintiff complained about a comment allegedly made by Brady that "I am going to make Loree [Doyle] a birthday cake and run my dick through it before I bring it in." Plaintiff brought it forward not because she thought it was sexual harassment or that the comment was directed at her, but because she believed there was "a lot of hostility in the office." In her opinion, the hostility arose from Brady's belief that Doyle was incompetent. D. at 88-89, Exhibit 5. Even then, she reported only that Brady made a "comment [that] was inappropriate." *Id.*

The Hospital took Plaintiff's report seriously and acted promptly.  Bertolino's predecessor, Paul Miller, spoke with Brady about this concern. Plaintiff admitted Miller had

---

[6]Bertolino was prepared to offer Plaintiff the opportunity to resign, but planned to terminate her if Plaintiff did not.

handled the situation very professionally. In fact, he apologized to Plaintiff for Brady's comment, told her it would not happen again and instructed her to report any further incidents. D. at 92, 162, 189.  Pendleton's response was so effective that Plaintiff thanked Bertolino for the role that she played in it.  D. at 91-92, Exhibit 6.

Plaintiff admitted in her deposition that this was the first and only time she brought forward a complaint that had anything whatsoever to do with purportedly sexual comments or conduct by Brady. D. at 176, 180-82, 186-87, 189. Skevington, who did not become Plaintiff's supervisor until approximately eleven months after the complaint,  was unaware that Plaintiff had reported to human resources this alleged "inappropriate" comment by Brady.[7]  Skevington Dec. 13.

### B. PLAINTIFF CANNOT ESTABLISH HER SINGLE COMPLAINT IN AUGUST 2002 PLAYED ANY ROLE IN THE DECISION TO TERMINATE HER MORE THAN FOURTEEN MONTHS LATER

#### 1. The Elements of A Retaliatory Discharge Claim

A retaliation claim requires a plaintiff to first make a *prima facie* showing that: 1) she engaged in a statutorily protected activity or expression; 2) an adverse employment action occurred; and 3) a causal link between the protected activity or expression and the adverse employment action exists. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir.2004). Having established a *prima facie* case, the burden then shifts to the employer to demonstrate a legitimate, non-discriminatory purpose for the employment action.  *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir.2001); *Septimus v. Univ. of Houston,* 399 F.3d 601, 607 (5th Cir. 2005).  If the defendant satisfies this burden, the plaintiff must then prove that the employer's proffered non-discriminatory purpose for the action is merely pre-textual.  *Id.*

---

[7]Brady allegedly said, "I am going to make Loree a birthday cake and run my dick through it before I bring it in."

2.      Plaintiff Did Not Engage In Protected Activity

Under Title VII, an employee has engaged in protected activity if she has: (1) made an EEOC charge or participated in a related investigation or proceeding; or (2) opposed an employment practice made illegal under Title VII. *Byers v. The Dallas Morning News, Inc.*, 209 F.3d 419, 427 - 428 (5th Cir. 2000).  At the date of her termination, Plaintiff had not filed an EEOC Charge, so she must satisfy this prong through the opposition clause. For the complaint to satisfy the opposition clause, the employee must hold an objectively reasonable belief that the practice she opposes is a violation of Title VII. *Id.* at 428.

Based upon the record, Plaintiff's complaint was limited to reporting a single crude comment made by a co-employee on August 23, 2002.[8] As she testified, despite the sexual overtone of the comment, she considered it to have been motivated by Brady's belief Doyle was incompetent, not gender based animosity.

> A: … I didn't want to be a party to it.  Because by not doing something about it, then that would make me a party to the comment.  And, uh, I mentioned it to Kathleen Bertolino.
>
> ****
>
> he laughed about it, so I assume that he was not remorseful about saying it.  So I mentioned it to -- because we'd had a lot of hostility in the office because, if I may speak freely, Patrick felt that Loree was incompetent, according to what he told us. And so there was a -- every time we tried to get along with Loree, who was the education manager, and do what she asked, there was a little undercurrent or a problem. And then this was said.  And so I mentioned it to Kathleen Bertolino -- Katherine Bertolino.
>
> Q:  Why did you choose to take this to Katherine Bertolino?

---

This comment was not directed toward Plaintiff.  D. 88-89, Exhibit 5.

[8]During her deposition, Plaintiff described other purported instances of sexual harassment by Brady that pre-dated August, 2002.  However, she admittedly "didn't complain," told no one or "just kept my mouth shut" until the email reporting the "birthday cake" incident to Bertolino.  D. at 177-78, 180-82, 187.

A:  Because I felt that it was an inappropriate comment.  I felt it
was offensive and inappropriate…

D. at 90.

Thus, Plaintiff reported one crude incident that was not in her own mind motivated by gender based animosity. This is far too little to satisfy the opposition requirement, that the complainant hold an objectively reasonable belief that the conduct about which she complains violates Title VII. *See, e.g., Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508 (2001) (holding no reasonable person could objectively believe that a single incident of crude conduct could violate Title VII).

3.   Even Under The Lenient Standards at the Prima Facie Stage, Plaintiff Has No Evidence to Establish A Causal Connection Between Her Complaint and Her Termination

To establish the causal connection between the protected activity and the adverse employment action at the prima facie case stage, the plaintiff must show that the protected activity was an element in the decision to take adverse action. *Long v. Eastfield College*, 88 F.3d 300, 310 n.4 (5th Cir. 1996). The consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the prima facie case stage:  (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures when taking adverse action against the employee, and (3) the temporal relationship between the employee's conduct and the adverse act. *See*, *Eugene v. Rumsfield*, 168 F.Supp.2d 655 (S.D. Tex. 2001) *citing*, *Nowlin v. RTC*, 33 F.3d 498, 507-08 (5th Cir.1994).

Considering these three factors refutes any suggestion of a retaliatory motive on the part of Pendleton. There is no suggestion Pendleton did anything other than follow its ordinary disciplinary procedures. Consistent with its policies, before terminating Plaintiff, the Hospital formally warned her about concerns regarding her work performance and the consequences of

further problems. These warnings were based upon complaints or reports from various individuals and/or objective data such as Plaintiff's attendance record.[9] D. at 93-95, 130, 149, Exhibits 7-10, 14. The first disciplinary action against Plaintiff came from Loree Doyle,[10] Plaintiff's confidante and "buffer" in her relationship with Brady. D. at 93, 161, Exhibit 7.

Likewise, the timing of the actions refutes a causal connection. Plaintiff received her first warning more than 10 months after Plaintiff reported Brady's "birthday cake" comment. *Id.* Debbie Skevington issued the second warning more than a year after Plaintiff made that report. D. at 94, Exhibit 8. Her termination occurred more than 14 months after the report. "Common sense, however, dictates that a lapse of one year or more between the protected activity and the adverse employment action cannot give rise to a presumption of causality." *DeLaGarza v. Potter*, 2006 WL 335621 (S.D. Tex.).

Finally, Skevington, who initiated the termination, knew nothing about the "cake" comment, nor was she aware Plaintiff had complained about it.  Skevington Dec. at 13. Knowledge is a prerequisite to a retaliation claim. "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Public Facility Management*, 179 F.3d 164 (5th Cir. 1999). *See also Barrow v. New Orleans, S.S. Ass'n.*, 10 F.3d 292, 298 n. 25 (5th Cir. 1994); *Corley v. Jackson Police Department*, 639 F.2d 1296, 1300 (5th Cir. Unit A, March 1981) ("[A]n employer cannot be guilty of retaliation for an employee's opposition to discrimination unless he is aware of that opposition.")

---

[9]Brady did not make any of these complaints, prepare the disciplinary documentation or participate in any of these meetings.  Bertolino Dec. at 6.

[10]Doyle observed an unfriendly relationship between Plaintiff and Brady from the time that they began working together.  However, Doyle never received a complaint that Brady had engaged in sexually harassing behavior toward any other employee.  Doyle Dec. at 11-12.

This is simply not a case where an employee with no prior history of discipline is fired within days of complaining about harassment and there is nothing to suggest a causal link between the complaint and the termination.

     4.    <u>Plaintiff Has No Evidence Suggestive of Pretext</u>

Even if Plaintiff could establish a causal connection between her complaint and her termination, she has no evidence that would suggest Pendleton's legitimate reason for terminating her are pretextual. When asked why she believed her single complaint made more than a year before her termination played a role in that decision, Plaintiff could provide no connection. D. 160-61. She simply disagreed with the hospital's conclusions about her job performance.

> I knew I had done a terrific job with the ACLS group. It wasn't even a question of whether I had organized it, and taken us through it, and gotten people certified. It was no question. And when they -- and I just had to laugh when they called me in with these piddly little complaints, because I had the whole thing on my shoulders.

D. at 163.

Plaintiff's disagreement with management's evaluation of her performance does not constitute proof of discrimination. *See Nichols v. Loral Vaught Systems, Corp.,* 81 F.3d 38, 42 (5th Cir. 1996)(plaintiff's subjective belief is insufficient to survive summary judgment). Additionally, even if Pendleton was wrong in believing that Plaintiff's job performance was unsatisfactory, that is not evidence of pretext or discrimination. *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). Federal anti-discrimination laws were not adopted to protect against ill-advised management decisions, but only decisions motivated by illegal discriminatory intent. *Id*. To survive summary judgment, she must produce proof, not just speculation. *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999)(speculation regarding retaliatory conduct insufficient to overcome employer's nondiscriminatory reason for acting).

### III.   PLAINTIFF'S FMLA CLAIMS

####    A.   FACTS: PENDLETON PROPERLY HANDLED PLAINTIFF'S SINGLE REQUEST FOR FMLA LEAVE AND DID NOT HOLD ANY POTENTIALLY FMLA QUALIFYING ABSENCE AGAINST HER

Throughout Plaintiff's employment, Pendleton maintained policies and posted notices that explained employees' rights under the FMLA.  These policies included procedures whereby qualifying employees could take up to 12 workweeks of leave during any 12-month period. Bertolino Dec. at 4.

Following this counseling, Plaintiff asserted that the unscheduled absences were due to "out of control" hypertension and she subsequently submitted a note from her cardiologist, Dr. Mary Ann Richter, purportedly substantiating this. D. at 75-77; Exhibit 2. However, none of the absences for which Plaintiff was written up coincided with the dates when she saw Dr. Richter nor did Dr. Richter's note even address any of the days for which she was being disciplined for missing. D. at 98, 102-03; Exhibit 8. Further, no evidence reflects that these absences were pursuant to care Plaintiff was receiving from any healthcare provider.  D. at 103.

Dr. Richter reported that she had seen Plaintiff on May 9, 12, 14 and 15.  Even though Plaintiff had not requested FMLA leave and she came "right back" to work, none of these absences adversely affected her attendance record.[11] See, D. at 77, 103; Exhibits 2, 8, 11.

As a result of Plaintiff's raising the fact she had hypertension, human resources director Katherine Bertolino[12] reviewed the Hospital's FMLA policy with her and suggested that she request FMLA leave if necessary.  *Id.*

---

[11]Though Plaintiff did not request FMLA then, the Hospital did not count her absences for purposes of its no-fault attendance policy because it knew that Plaintiff was under Dr. Richter's care at this time.  Doyle Dec. at 14-15.
[12]The supervisor of the education department, in which Plaintiff worked, reported to the director of human resources.  Bertolino Dec. at 2.

On September 18, 2003, Plaintiff submitted a request for intermittent FMLA leave, "when hypertensive." D. at 106-08; Exhibit. 11. Bertolino accepted and approved the request, though Plaintiff did not take any time off pursuant to it before her termination on November 11, 2003. D. at 108, 248-49.

Plaintiff made her second request for leave on November 11, 2003 at 2:40 p.m., almost three hours after she had been terminated. Plaintiff made the request by faxing to Bertolino's office a handwritten note from Dr. Kenneth Veca seeking time off because of a medical problem with her hip.[13] D. at 262, 270; Exhibit 29. Bertolino did not approve this request because she and Skevington had terminated Plaintiff earlier that day.  Bertolino Dec. at 11.

### B.    THE STANDARDS FOR ASSESSING FMLA CLAIMS

Under the FMLA, employers have both prescriptive and proscriptive obligations to their employees.  *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 763 (5th Cir. 2001); *Chafin v. John H. Carter, Inc.*, 179 F.3d 316, 319 (5th Cir. 1999). "Employers have a prescriptive obligation under the FMLA –  they must grant employees substantive rights guaranteed by the FMLA – and they have a proscriptive obligation – they may not penalize employees for exercising these rights."  *Chaffin v. John H. Carter, Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999) quoting, *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998).  When an employee asserts that her employer denied or otherwise interfered with her substantive rights under the FMLA, as in this case, she asserts an "interference claim."  29 U.S.C. § 2615; *Bocalbos v. Nat'l Western Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998).

---

[13]The note from Dr. Veca is attached to Plaintiff's deposition both Exhibit 15 and Exhibit 29.  This exhibit, dated November 11, 2003, represents the time at which Dr. Veca expressed the opinion that Plaintiff needed to take time off from work due to her hip problem.  D. at 160.  Plaintiff twisted her lower back while moving file folders on or about August 21, 2003, but after seeing a doctor, she was released to regular duty, without restrictions, the same day. D. at 233, 235, 275-77.  She later saw Dr. Veca for hip pain that began on or about October 4.  D. at 251.  Dr. Veca

## C.   PLAINTIFF'S REQUEST FOR FMLA LEAVE MADE AFTER SHE HAD BEEN FIRED CAME TOO LATE

Plaintiff alleges that the Hospital violated the FMLA by denying another request for leave on November 11, 2003. D. at 263-64. Nonetheless, it is undisputed[14] that Plaintiff submitted this request for leave via facsimile to Pendleton's human resources department at 2:40 p.m., almost three hours after she had been fired. D. at 145-46, 153, 273. Because Plaintiff was no longer a Pendleton employee when she requested leave, no FMLA violation occurred and Plaintiff's claim must be dismissed. *See*, *Brohm v. JH Properties, Inc*., 947 F.Supp. 299, 302 (W.D.Ky. 1996), *aff'd* 149 F.3d 517, 523 (6th Cir. 1998)(request received after termination is irrelevant); *Mayo v. Trinity Marine Industries, Inc.*, 1999 WL 104421 *3-4 (E.D.La. 1999)(plaintiff was no longer a qualified employee for FMLA after his termination).

Despite some attempts to cloud this issue, Plaintiff's own sworn testimony establishes that she was fired at approximately noon on November 11, 2003; the document marked D. Exhibit 15[15] represents when Dr. Veca told **her** that she needed time off from work due to her hip pain; and this information was sent to Bertolino at 2:40 p.m.  D. at 143, 146, 153, 160, 273.

> Q:  So you walked out of the room and you stopped in the department briefly, said, "I think I've been fired," you left, went home, called your attorney and you called Dr. Veca?
>
> A:  Uh-huh.

D. at 153.

---

later scheduled an MRI examination of Plaintiff's hip.  D. at 255-56.

[14]Before acknowledging that she had in fact been fired a few hours before submitting this request to the human resources department, Plaintiff attempted to represent that she was not fired until later in the day, after she submitted her request/doctor's note.  D. at 266-67. D. Exhibit 14, which Plaintiff prepared herself, also reflects that she was fired at about noon on November 11 and later asked her doctor to send her "FMLA request" to human resources.  D. Exhibit 18, also prepared and signed by Plaintiff, reflects this same timeline.

[15]Deposition Exhibit 29, introduced by Plaintiff, includes the same note identified as Deposition Exhibit 15.

> Q:  Well, I guess more to the point, Exhibit 15 is when he expressed the opinion you needed time off from work as a result of your hip problem?
>
> A:  Uh-huh.

D. at 160.

The foregoing testimony establishes that Plaintiff submitted her November 11 request for FMLA only **after** she had been fired.  Therefore, Pendleton committed no violation by denying the request.

### D.  PENDLETON NEVER HELD ANY OF PLAINTIFF'S ABSENCES THAT MIGHT HAVE QUALIFIED FOR FMLA LEAVE AGAINST HER

Although not clearly stated in the Complaint, Plaintiff appears to be alleging that Defendant improperly disciplined her for FMLA protected absences. The facts show quite the opposite. Specifically, the Hospital did not "count" for purposes of its no-fault attendance policy any of the occasions that Plaintiff missed work (May 9, 12, 14 and 15, 2003) to see Dr. Richter, who was purportedly putting Plaintiff on medication to control her blood pressure. D. at 95-98, Exhibits 2, 9. Pendleton did this even though Plaintiff had not requested FMLA leave and did not produce documentation to substantiate her reasons for missing work until September, 16, 2003. D. at 98.

When Pendleton disciplined Plaintiff for excessive absenteeism, it did so on the basis of absences that occurred for non-FMLA protected reasons. While some of these absences were reportedly due to Plaintiff's personal illness, there is no evidence those illnesses related to her hypertension. Even had they, Plaintiff did not provide information from which Pendleton should have discerned that any of the absences qualified for FMLA protection. D. at 102-03, Exhibit 8.

Further, after Plaintiff complained about having been written up on September 15, Bertolino reviewed the Hospital's FMLA policy with her and encouraged Plaintiff, if

14

appropriate, to ask her doctor certify her need for FMLA leave. D. at 98-99. Plaintiff

subsequently submitted a request for intermittent leave "when hypertensive," which Bertolino

approved. D. at 107-08, Exhibit 11.  Plaintiff never asked for or took time off pursuant to this

request. D. at 106, 108, 248-50. In fact, after being written up, Plaintiff did not experience any

further unscheduled absences during the remainder of her employment with Pendleton.

There is simply no evidence Defendant took any action against Plaintiff because of an

absence from work protected by the FMLA.

## IV.   PLAINTIFF'S TERMINATION HAD NOTHING WHATSOEVER TO DO WITH A DISABILITY

### A.   FACTS: PLAINTIFF HAD MINOR MEDICAL CONDITIONS, NOT A DISABILITY

During her employment, Plaintiff experienced a number of different medical issues.

Some of these issues were very short-lived while others lasted several weeks. In June 2002,

Plaintiff experienced pain related to a broken finger, which she may have injured before going to

work for Pendleton. D. at 138, 229-30. In any event, she missed no work because of this injury

and Pendleton's knowledge regarding it was very limited.  D. at 54, 231.  In May, 2003, Plaintiff

found out that she had high blood pressure. She learned of her high blood pressure when she

purportedly passed out in her office on or about May 9, 2003.  D. at 71, 74.  She testified that she

was taken to the Hospital emergency room (ER), but then drove herself to her doctor's office

because she was feeling better and the triage nurse in the ER did not "have time" to see her.  D.

at 135-37.  After seeing a doctor four times during a period of about one week, she came "right

back" to work and resumed her regular duties, without seeking or receiving any

accommodations.  D. at 75, 77-78, 280. Since that time, she has kept her blood pressure under

control with medication.  D. at 74, 77, 210, Exhibit 2.

During the last few months of her employment, Plaintiff began experiencing some problems with arthritis. She aggravated that condition by twisting her back while moving some files.  D. at 32, 35.  In October 2003, she began experiencing hip pain related to this incident, although this pain now "comes and goes."  D. at 209, 251.  Due to Plaintiff's hip pain, her supervisor loaned her a cane, which she used for about two days.  Use of the cane improved her mobility and Plaintiff continued to perform her regular duties.  She does not now use a cane on a regular basis.  D. at 63-64, 207, 209. While working for Pendleton, Plaintiff did not miss any time from work due to the arthritis or hip pain.  D. at 106.

At no time did Plaintiff's medical conditions ever cause her to require an accommodation and she testified that she was always able to perform her duties well. D. at 207.

**B.  PLAINTIFF'S MEDICAL CONDITIONS DO NOT RISE TO THE LEVEL OF A DISABILITY WITHIN THE MEANING OF THE ADA**

"As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability."  *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).  The ADA defines "disability" three ways:

> The term "disability" means, with respect to an individual
>
> (A)    a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)    a record of such an impairment;
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139 (U.S. June 22, 1999); *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S. Ct. 2162 (U.S. June 22, 1999).  "Accordingly, to fall within this definition one must have an actual disability (subsection

16

(A)), have a record of a disability (subsection (B)), or be regarded as having one (subsection

(C)).” *Sutton v. United Air Lines, Inc.*, 119 S. Ct. at 2145.

According to EEOC guidelines, impairments do not substantially limit a major life

activity unless they render the individual:

> (i)      Unable to perform a major life activity that the average person in the general population can perform; or

> (ii)     Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person can perform the same major life activity.

*See* 29 C.F.R. § 1630.2(j)(i) and (ii); *Rogers v. International Marine Terminals, Inc.*, 87

F.3d 755, 758.  “Whether an impairment substantially limits a major life activity is determined in

light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and

(3) its permanent or expected permanent or long-term impact.”  *Dutcher v. Ingalls Shipbuilding*,

53 F.3d 723, 726 (5th Cir. 1995) (citing 29 C.F.R. § 1630.2(j)).

Plaintiff admitted that she was not “disabled” within the meaning of the statute at the

time of her termination:

> I am disabled now.  I mean, then I did not think I was disabled.  I thought I was having some health problems, but, um,  I didn't think I was disabled in any way.  I thought  I would get better.  I never had a problem like that before.  But since I've been off, now I've gotten worse.

D. at 68.

By her own account, Plaintiff simply experienced, among other things, some **temporary**

difficulty driving or walking[16] after twisting her back in August, 2003.  During this period,

---

[16]Plaintiff discovered that she had arthritis during the last few months that she worked for Pendleton.  Though she continued to do her job without accommodation, Plaintiff apparently aggravated her arthritis when she twisted her

however, she was still able to walk and do her job.  D. at 64-67, 207, 211, 238, 274-75.  She

never asked for an accommodation and testified that she was able to fulfill her duties effectively.

D. at 69, 78, 207, 242, 280.  More importantly, the Hospital never modified or limited her duties.

D. at 78, 207, 274, 276.  Thus, no evidence suggests that Plaintiff was disabled during the time

she worked for Pendleton.

### C. PLAINTIFF HAS NO EVIDENCE HER VARIOUS MEDICAL CONDITIONS WERE CONSIDERED AS A FACTOR IN THE DECISION TO TERMINATE HER EMPLOYMENT

To establish liability under the ADA, there must be a casual connection between a

plaintiff's disability and an adverse employment action. The adverse action must be taken "on

account of" the disability. *McInnis  v. Alamo Community College Dist.*, 207 DF.3d 276 (5th Cir.

2000); *Hamilton v. Southwestern Bell Telephone Co.,* 136 F.3d 1047, 1049 (5th Cir.1998).

Even if Plaintiff could establish that she was disabled within the meaning of the ADA,

she has not produced evidence that Pendleton's legitimate nondiscriminatory explanation for her

termination was pretextual. To the contrary, when Plaintiff was asked why she believed her

medical condition was a factor in the decision to terminate her employment, she offered only

speculation.

> because I was  having some health problems, I thought they might
> not want their -- want me to be insured with them. I really thought
> they were going to protect their -- their, uh, assets and say, "Get rid
> of her; she's a problem" -- … -- "you know, health wise."

D. at 167.  In fact, Plaintiff had no information that those making the decision to fire her had ever

seen the medical documents upon which her conjecture is based. D at 167-68.  Therefore, she

---

back in August.  This temporarily caused significant pain and made walking more difficult (D. at 34), although she
was still able to do her job. Plaintiff used a cane to help her walk for approximately the final two days of her
employment with Pendleton.  D. at 32, 35-36, 63-65, 67.  She now uses a cane only sporadically, though she claims
to have difficulty using stairs because she becomes short of breath. D. at 209-210.  In subsequent jobs, Plaintiff had
difficulty sitting for long periods of time and in fact needed to get up and walk periodically.  D. at 38-39.

cannot establish that her medical conditions, much less a disability, had anything to do with her termination.

## V. <u>PLAINTIFF'S HARASSMENT CLAIMS</u>

### A. FACTS: PLAINTIFF AND BRADY HAD A PERSONALITY DISPUTE

From the beginning of the time that they began working together, Plaintiff and Brady had an unfriendly relationship. D.  89-90, 123, 161, 195, 205.  Plaintiff testified that Brady "hate[d]" her and that he sexually harassed her on three occasions during the first several months that they worked together. D. at 175-88, 216.  Plaintiff described the incidents that she characterized as sexual harassment by Brady, the last of which occurred on or before June 2002.  D. at 182.

> Q:  How far up your leg did he run his hand?
>
> A:  Up past my knee?
>
> Q:  Okay.  Just a little past your knee?
>
> A:  Yeah, but it was enough.
>
> Q:  Okay.  Again, I'm not judging; I just want to get a description. Did you tell anybody about this?
>
> A:  No, I didn't complain.
>
> Q:  Okay.  Why not?
>
> A:  Why not?
>
> Q:  Why not?  I'm sorry.
>
> A:  I'm not a tattletale.  I don't constantly – I did – most of this, unless it was really major, I didn't, um – you know, I just didn't – probably just remembered it later, I guess that it happened when – (mumbling)
>
> *********
>
> Q:  Let's go to Paragraph 7, Item D: "In December 2001, Brady hugged plaintiff and ran his hand down plaintiff's back and butt?
>
> A:  Uh-huh.

19

\*\*\*\*\*\*\*\*\*

> Q:  Well, everybody was – my back was to my office, and everybody else was out in the office.  And, um, I think, uh, he basically was saying "Merry Christmas" because we were all leaving for the holiday.

\*\*\*\*\*\*\*\*\*

> Q:  Did you say anything to him when this happened?

> A:  No, no, no.  I just said "Merry" – I said, "Have a Merry Christmas" and just patted him on the back and said –

> Q:  Did he say anything else besides "Merry Christmas"?

> A:  He said, "Have a safe trip."

> Q:  Did you tell anybody else about this?

> A:  Uh-uh.  No.

D. at 180-81.

Plaintiff alleges that after reporting the "cake" comment, Brady began to treat her in a retaliatory manner. D. at 189.

> Q:  Okay.  Now, as I understand this, and read Paragraph 9 [of the Complaint], Brady changed his sexual harassment tactic, this time in a retaliatory manner; is that right?

> A:  Yes.

> Q:  So what you're saying there is that – uh --

> A:  I'm saying that this exactly happened as I wrote it.

D. at 189-90.

She testified that Brady's conduct included bumping her in the hallway, playing practical jokes and purportedly sabotaging her work.  D. at 194, 196-97, 199.

**B.** **PLAINTIFF'S SEXUAL HARASSMENT CLAIMS AGAINST PENDLETON ARE TIME-BARRED**

In Louisiana, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. §2000e-5(e)(1).  The Fifth Circuit has explained that "Congress intended the limitations period contained in §2000e-5(e)(1) to act as a statute of limitations."  *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.,* 139 F.3d 532, 537 (5th Cir. 1998); *Hornsby v. Conoco, Inc.,* 777 F.2d 243, 247 (5th Cir. 1985)(applying limitations period to sexual harassment claim). The limitations period serves to protect employers from the burden of defending claims arising from incidents that are long past.  *Delaware State College v. Ricks,* 449 U.S. 250 (1980).

Plaintiff cannot base her claim of sexual harassment upon incidents that occurred more than 300 days before the filing of her charge of discrimination. *Webb,* 139 F.3d at 537. Such incidents are the legal equivalent of acts that occurred before Title VII was passed. *United Airlines v. Evans*, 431 U.S. 553, 558 (1977).  Plaintiff filed her EEOC Charge on February 19, 2004. D. at 212, Exhibit 19.  This Charge did not include a substantive allegation of sexual harassment, although it states that Plaintiff had complained of sexual harassment in "August 2002." *Id.* On October 29, 2004, she amended the Charge to include an allegation of sexual harassment. D. at 213, Exhibit 20.  Based upon these documents, even if Plaintiff had included a claim of sexual harassment in her original Charge, which she did not do, actions based upon incidents that occurred before April 26, 2003, are time-barred. Further, according to the Complaint and Plaintiff's sworn testimony verifying the allegations therein, not a single alleged incident of sexual harassment occurred after June of 2002.[17]  D. at 175-188.

---

[17] The cake comment, that was not directed at or about Plaintiff and as such should not be considered part of her claim, also occurred well more than 300 days prior to Plaintiff's filing her original Charge of Discrimination.

Therefore, because no alleged acts of sexual harassment occurred within the limitations period, the claim is untimely and it must be dismissed.

### C.    PLAINTIFF'S TESTIMONY ESTABLISHES THAT HER DISPUTES WITH BRADY WERE THE PRODUCT OF PERSONAL ANIMOSITY, NOT RETALIATORY ANIMUS

To support a retaliation claim based upon Brady's conduct, Plaintiff must prove that she participated in protected activity, such as making a claim of sexual harassment; suffered co-worker harassment sufficiently severe or pervasive as to alter the conditions of her employment and create a hostile or abusive work environment; Pendleton knew or should have known of the harassment and failed to take steps reasonably calculated to end the abusive behavior; and there was a causal link between her protected activity and the discriminatory work environment. *Mattern*, 104 F.3d at 712.

### 1.    Plaintiff's Testimony Establishes The Alleged Retaliatory Harassment Was The Product of Personal Animosity, Not Anger Over A Complaint

Assuming Plaintiff's report of the cake comment was protected activity[18], her retaliation claim cannot proceed because she has no evidence to show Brady's conduct was linked to that complaint. To the contrary, the record shows that Plaintiff and Brady had an unfriendly relationship before Plaintiff reported the "birthday cake" comment.  D. at 89, 120-23, 131, 161, 187.  In fact, rather than attributing these hard feelings to a single incident, Plaintiff admitted that they were grounded in a more general dislike.

> A:  She said, I know.  "He's out for you.  Be careful.  He's going to get you."  She said, "You're going to be lucky if you have a job."  Well, she said if anything happened to her, when she left, I wouldn't have a job; he'd make sure of that.
>
> Q:  Did she say why?

---

[18] This claim should fail for the same reason the retaliatory termination claim fails; Plaintiff did not engage in protected activity. For purposes of brevity, Defendants adopt that argument by reference rather than repeating it.

A:  She didn't have to.  I – I have no idea.  I just – I guess he – he didn't like her.  I don't think he will he [sic] ever say he did.  **And he didn't like me.  And I don't know why**.

D. at 195. (emphasis added).

Indeed, Plaintiff testified that when Brady made the "birthday cake" comment (and thus before she reported it to anyone), there was already "a lot of hostility in the office."  D. at 89. Therefore, she cannot establish that Brady's subsequent alleged behavior was due to her having reported the "inappropriate" comment. Likewise, she admits that Brady's alleged retaliatory behavior was not directed exclusively toward her.[19] For example, Plaintiff complains of an instance in which Brady allegedly accessed her office computer improperly. Yet she claims Brady did the same thing to other employees who had not made any complaints. More importantly, this incident occurred **before** August, 2002, when she made her complaint and cannot have been motivated by a retaliatory animus. D. at 200-01.

> 2.    Brady's Alleged Conduct Was Not Sufficiently Severe or Pervasive Enough To Constitute an Actionable Hostile Environment Claim

In assessing whether a workplace constitutes a hostile environment, a number of factors are relevant. These factors include the "frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cain v. Blackwell*, 246 F.3d 758, 760. (5th Cir. 2001) *citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Title VII was meant to bar only conduct that destroys the employee's opportunity to succeed in the workplace. *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871,874 (5th Cir. 1999).  Teasing, off-hand comments and isolated incidents do not establish an actionable hostile environment.  *Id*.

---

[19]Plaintiff admitted that one of the acts she referred to as retaliatory was a prank that Brady had also played on Elaine Villavaso.  D. at 196-97.  The same is true of at least one of her time-barred allegations of sexual harassment.

23

Plaintiff testified that Brady's actions amounted primarily to teasing, comments and other isolated incidents, which were not just directed toward her. D. 194-201. She claims that Brady intentionally switched or misspelled words on materials that she used in making presentation, yet she admits that she did not proofread the documents herself. D. at 201. Most significantly, Plaintiff admits that these actions were not so severe or pervasive as to destroy her opportunity to succeed in the workplace. In fact, she testified that she consistently did a good job in spite of Brady's supposed harassment. D. at 207.

Consequently, Plaintiff's retaliation claim based upon Brady's conduct cannot proceed because she cannot establish a causal connection between the conduct and protected activity, nor is the conduct complained of sufficiently severe or pervasive to be actionable.

## VI.   PLAINTIFF'S CLAIMS AGAINST BRADY MUST BE DISMISSED AS A MATTER OF LAW BECAUSE BRADY CANNOT BE HELD PERSONALLY LIABLE

Plaintiff has absolutely no legal basis for maintaining claims against Brady personally. First, it is well established that there in no individual liability under Title VII.  *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999); *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994); *Smith v. Amedisys Inc.*, 298 F.3d 434 (5th Cir. 2002).  Second, individual employees cannot be liable under the ADA.  *Pritchard v. Southern Co. Servs.*, 102 F.3d 1118, 1119 (11th Cir. 1996), *cert. denied,* 520 U.S. 1274 (1997)(no personal liability under the Rehabilitation Act or the ADA); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279-81 (7th Cir.)(collecting cases and finding that the ADA does not impose individual liability).

Third, the Louisiana Employment Discrimination Act, La. R.S. 23:301 *et. seq*., does not include a cause of action against individuals, even those who, unlike Brady, are supervisors.  *See*

D. at 183.

*McCain v. City of Lafayette*, 741 So.2d 720, 723 (La. App. 3 Cir. 5/5/1999); *Spears v. Roundtree*

*Oldsmobile-Cadillac Co.*, 653 So.2d 182 (La. App. 2d Cir. 1995); *Rhyce v. Martin*, 173 F.Supp.

2d 521 (E.D. La. 2001).

Fourth, even though supervisors could be liable individually for violations of the FMLA,

Plaintiff has not alleged any facts supporting the proposition that he interfered with the exercise

of her FMLA rights.[20]  Moreover, even though Plaintiff has referred to Brady as a supervisor she

has admitted, there is no proof that he had the authority to hire, fire, evaluate or discipline

Plaintiff.  Accordingly, Plaintiff has no basis for any of her claims against Brady and they must

be dismissed.

**VII.    <u>CONCLUSION</u>**

Defendants respectfully request their motion for summary judgment be granted, and that

Plaintiff's claims be dismissed, with prejudice. In addition, Pendleton should be awarded its

costs, including attorney's fees, incurred in defending this action.

Respectfully submitted, this 25th day of July, 2006.

*s/Edward F. Harold*
EDWARD F. HAROLD, T.A.
Louisiana Bar No. 21672
A. KEVIN TROUTMAN
Louisiana Bar No. 27668
FISHER & PHILLIPS LLP
201 St. Charles Avenue
Suite 3710
New Orleans, LA 70170
Telephone: (504) 522-3303
Telecopy:   (504) 529-3850

ATTORNEYS FOR DEFENDANTS
PENDLETON MEMORIAL METHODIST
HOSPITAL AND PATRICK BRADY

---

[20]As explained herein, it is undisputed that Bertolino and Skevington terminated Plaintiff and denied her subsequent request for FMLA leave.  D. at 145-46, 266.

## <u>CERTIFICATE OF SERVICE</u>

I, EDWARD HAROLD, do hereby certify that on July 25[th,] 2006 I electronically filed DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

None.

and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:

Kenneth K. Orie<br>
Law Offices of Kenneth K. Orie<br>
P. O. Box 74016<br>
Metairie, LA 70033-4016

<u>s/Edward F. Harold</u><br>
EDWARD HAROLD