**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**PATRICIA HALLBERG**                                        **CIVIL ACTION**

**VERSUS**                                                   **NO: 05-630**

**PENDELTON MEMORIAL**                                       **SECTION: "K"(5)**
**METHODIST HOSPITAL, ET AL.**

**ORDER AND REASONS**


        Before the Court is the Motion for Summary Judgment (Rec.Doc.No. 22) of Defendants

Pendleton Memorial Methodist Hospital and Patrick Brady. After reviewing the pleadings,

memoranda and relevant law, the Court hereby grants the motion for the reasons assigned below.

# I. BACKGROUND

Plaintiff Patricia Hallberg is a registered nurse, and was employed with Pendleton Memorial Methodist Hospital (Pendleton) beginning in April 2001 as an instructor in Pendleton's education department until her termination in November 2003. She instituted these proceedings alleging sexual harassment in violation of Title VII, improper denial of leave in violation of the Family and Medical Leave Act (FMLA), and discrimination based on her disability in violation of the Americans with Disabilities Act (ADA).

A.      *Sexual Harassment*

In the first count of her Complaint, Plaintiff alleges that between May 2001 and November 2003, her alleged supervisor Patrick Brady sexually harassed her by acting in the following way:

> (a)      In May 2001, Brady called plaintiff to his office and showed her on his computer screen a lewd cartoon with a black woman appearing as a gorrila (sic) getting out of a car with no clothes on and her private parts exposed. Mr. Brady commented on the cartoon and said to plaintiff, "That's one ugly black whore."[1]
>
> (b)      In June 2001, Brady again showed plaintiff lewd pictures of women in sexual acts.
>
> (c)      In November 2001, plaintiff was hanging certificates in her office when Brady came in, placed his hand on plaintiff's ankle and ran his hand up plaintiff's leg, and said "your legs are cute as hell."

---

[1]  Plaintiff is a caucasian female, and makes no allegations of harassment or discrimination based on race. *See* Defs.' Mot. Summ. J., Exhibit 18 (Rec.Doc.No. 22).

     (d)      In December 2001, Brady hugged plaintiff and ran his hand down plaintiff's back and butt (sic).

     (e)      In January 2002 through June 2002, Brady offensively hugged plaintiff's (sic) on several occasions, and on one occasion touched plaintiff's breast and said, "You could have a lot of fun f****** my partner."

*See* Complaint, p. 3 (Rec.Doc.No. 3).

Plaintiff alleges that starting in August 2002, she complained to the Education Manager, Personnel Manager, and the Director of Human Resources at the hospital, but that Pendleton failed to stop the sexual harassment.  Plaintiff further contends that because of her complaints, Brady continued to sexually harass her; however, the tone of the sexual harassment became retaliatory. Plaintiff illustrates the change in the nature of the harassment with the following examples:

     (a)      In August 2002 through January 2003, as plaintiff was walking by, Brady shoved a wheel chair in her path. Brady ran into plaintiff, hitting her on the shoulder several times in different corridors and in the copy machine room and pretended it was an accident. On one occasion, plaintiff was working on her office computer when something tapped her on the shoulder and startled her. She whirled around and saw an arm and hand that was used to practice IV insertion tapping on her and Brady laughing at her being startled.

     (b)      From August 2002 through February 2003, Brady jumped out at plaintiff in the file room on several occasions when plaintiff went there to file forms.

     (c)      On different occasions in January 2003 through November 2003, Brady would sabotage plaintiff's work to make plaintiff look "bad" or incompetent. Brady would switch, misspell or erase words in plaintiff's presentation to nursing classes to make her look bad. When Leif Pederson, Coordinator of Hospital's Health Promotions Office requested that plaintiff give a talk to students on alleviation of health problems associated with lead, Brady got Leif Pederson to cancel the talk. Brady also removed plaintiff from giving lectures as a

member of the Speaker's Bureau for Hospital.

    (d)    In August 2003 the position of Education Manager was vacant. Brady applied to fill it and told plaintiff, "If I get this job, your head will roll."

*See* Complaint, p. 4-5 (Rec.Doc.No. 3).

There was also an incident that occurred in August 2002 involving a comment made by Brady, when he said, "I am going to make Loree [Doyle] a birthday cake and run my d*** through it before I bring it in." Pl.'s Dep., p. 88-89. Plaintiff argues that because of her charges of sexual harassment she was terminated in November 2003. *Id.* at 6.

### B.    *Family and Medical Leave Act Violation*

Plaintiff contends that in November 2003, Pendleton inappropriately handled her medical leave request in violation of the FMLA. She alleges that she was diagnosed in May 2003 with high blood pressure, chest pain, shortness of breath, and palpitation. Moreover, she contends that she had to sporadically walk with a cane because of her hip problems. She contests that she applied for FMLA leave in September 2003, and Pendleton took no action nor gave any explanation for ignoring the application.

She also contends that she requested FMLA leave on November 11, 2003, the day of her termination. She describes that she was fired over the phone, and when she asked about her FMLA leave, her supervisor responded that "the [doctor's] note did not count." *See* Pls's Dep., pp. 260-267.

C.      *Americans with Disabilities Act Violation*

Plaintiff alleges that her illness as well as her hip problems entitled her to protection from employment discrimination under the ADA. She further alleges that her termination because of these impairments violated the ADA as well as the Louisiana Employment Discrimination Law (LEDL), LA. REV. STAT. ANN. § 23:323 (2006).

D.      *Retaliation*

Although Plaintiff does not explicitly list the claim in her Complaint, it is clear that she alleges a claims for retaliation. She brings a claim of retaliatory discharge that she contends occurred because of her prior complaint of sexual harassment and/or her alleged requests to accommodate her disability. Moreover, she claims that Patrick Brady's treatment of her subsequent to her complaint of sexual harassment was retaliation that resulted in an adverse employment condition.

*Defendants' Contentions*

Defendant brings the instant motion for summary judgment alleging that 1) Plaintiff cannot meet her burden of production of evidence to show Defendants' legitimate, non-discriminatory reason for discharge is pretext for discrimination; 2) Plaintiff cannot establish that her single complaint of sexual harassment in August 2002 played any role in the decision to terminate her more than fourteen months later; 3) Plaintiffs claims under the FMLA are not viable because Pendleton properly handled Plaintiff's single request for FMLA leave and did not hold any potentially FMLA qualifying absence against her; 4) Plaintiff's termination had nothing whatsoever to do with a

disability; 5) Plaintiff's harassment claims should be characterized as a personality dispute and are otherwise time-barred; and 6) Plaintiff's claims against Brady should be dismissed as a matter of law because Brady cannot be held personally liable under Title VII, the ADA, or the LDEL.

Defendants proffer three specific reasons for Plaintiff's termination. First, on or about June 9, 2003, Loree Doyle, a supervisor of Plaintiff, prepared a disciplinary report concerning an incident involving Plaintiff's rude and inappropriate conduct towards two nurses at Pendleton. *See* Def.'s Mtn. Summ. J., Exhibit 9, ¶ 14 (Rec.Doc.No. 22). Second, on September 15, 2003, Debbie Skevington initiated a disciplinary action against Plaintiff for her excessive absences. Skevington affirms that Plaintiff had six unscheduled absences within the previous four month period. *See* Def.'s Mtn. Summ. J., Exhibit 8, ¶ 6 (Rec.Doc.No. 22). Finally, in early November 2003, Debbie Skevington and Kathleen Bertolino responded to multiple complaints of Plaintiff's errors with regard to a Advanced Cardiac Life Support course that Plaintiff was coordinating. *See* Def.'s Mtn. Summ. J., Exhibit 8, ¶ 7 (Rec.Doc.No. 22). Pendleton submits these reasons as its legitimate, nondiscriminatory reasons for Plaintiff's termination.

## II. LEGAL STANDARD

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

 "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment.  Fed. R. Civ. P. 56(e).  Rather, the non-movant must come forward with "specific facts" that establish an issue for trial.  *Id*.  When deciding a motion for summary judgment, the Court must avoid a "trial on the affidavits." *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact. *Id*.  To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc*., 828 F.2d 291, 294 (5th Cir. 1987).

# III. ANALYSIS

The question before the Court is whether Plaintiff has raised a genuine issue of material fact such that Defendant is not entitled to judgment as a matter of law with respect to Plaintiff's claims of sexual harassment, an FMLA violation, discrimination because of a disability, and retaliatory discharge.

### A.    Sexual Harassment

In order to establish a prima facie case for a hostile work environment claim, a plaintiff must allege or produce evidence that shows: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Green v. Administrators of Tulane Educational Fund*, 284 So.2d 642 (5th Cir. 2002); *Mota v. Univ. of Tex. Houston Health Science Ctr.,* 261 F.3d 512, 523 (5th Cir.2001). *See also Broadway v. Dep't of Homeland Security,* 2005 WL 1400452, (E.D. La. June 2, 2005)(Duval, J.).

Defendants argue that the sexual harassment claim is time-barred and/or that deteriorating relationship between Plaintiff and Brady was a personality dispute and was not based on sex. With respect to the time-bar, in a "deferral" state like Louisiana, an aggrieved person has 300 days from the date of the last act of discrimination to file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1); *see Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343,

351 (5th Cir.2001); *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir.1998); *Messer v. Meno,* 130

F.3d 130, 134 & n. 2 (5th Cir.1997). Here, the time bar does not apply because the last acts of

harassment allegedly occurred in August 2003, and the EEOC charge was filed in January 2004,

well within the 300 day limit. *See* Exhibit 18, Mot. Summ. J. (Rec.Doc.No. 22).

      As the Court has stated before, the Plaintiff must show that the harassment either

culminates in an adverse employment decision or that the conduct was so severe and pervasive

as to affect a condition of employment. *Marks v. Shaw Contractors,* 2001 WL 1426649 (E.D. La.

Nov. 13, 2001)(Duval, J.). The Court has previously described the hostile work environment

claim absent a showing of adverse employment decision:

>       The purpose of a claim for hostile work environment is to
> "level the playing field for [those in a protected class] who work by
> preventing others from impairing their ability to compete on an equal
> basis with [co-workers]. *De Angelis v. El Paso Municipal Police
> Officers Ass'n,* 51 F.3d 591, 594 (5th Cir.1995). A claim for hostile
> environment "embodies a series of criteria that express extremely
> insensitive conduct so egregious as to alter the conditions of
> employment and to destroy equal opportunity in the work place." *Id.*
>       To be actionable, the challenged conduct must create an
> environment that a reasonable person would find hostile or abusive.
> *Farpella Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th
> Cir.1996). Whether the environment is hostile or abusive depends
> upon "the totality of the circumstances." *Id.* All the circumstances
> must be considered including, "the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance. *De
> Angelis v. El Paso Municipal Police Officers Ass'n,* 51 F.3d 591, 594
> (5th Cir.1995). A plaintiff must also demonstrate that she was
> subjected to the hostility because of her membership in the protected
> class. *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310 (2d
> Cir.1999). "In other words, an environment which is equally hostile
> for both men and women ⋯ does not constitute a hostile
> environment⋯." *Id.*
>       Additionally, the [illegal] harassment must be sufficiently

> pervasive or severe to alter the conditions of employment and create an abusive working environment. *Farpella-Crosby*, 97 F.3d at 806. The "mere utterance of an ⋯ epithet which engenders offensive feelings in an employee" is not alone sufficient to support Title VII liability. *Id.* Further, [neutral] hostile conduct cannot be used to support a hostile environment claim. *Id.* at n. 2. Title VII does not protect employees from hostile conduct that is not based upon their protected status. *Id.*

*Giardina v. Lockheed Martin, Corp.*, 2003 WL 21634934, at *3-4 (July 3, 2003).

The conduct in this case, though apparently occurring over a long period of time, amounted to boorish and insensitive behavior as opposed to being severe and pervasive. While some of the conduct was more sexual in nature, it would be best characterized as a mere offensive utterance. Moreover, while there are some allegations of inappropriate touching, even in Plaintiff's characterization of the events, she made no allegation of physical intimidation. Finally, much of the complained of conduct was not directed at her, and therefore, could not be because of sex such that it would support a sexual harassment charge.

### B.    Family and Medical Leave Act

To bring a claim of discrimination or retaliation claim under FMLA, a plaintiff must show that her employer either failed to provide her with, or otherwise interfered with, the substantive rights granted to employees under the statute, or that her employer somehow engaged in discriminatory or retributive acts because of the employee's exercise of her FMLA rights. *Richardson v. Monitronics International, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).

In order to establish a *prima facie* case for retaliatory discharge, the employee must show she 1) engaged in protected activity; 2) was terminated; and 3) that there is a causal link between

the protected activity and the termination. *Id.*(*citing Hunt v. Rapides Healthcare Sys., Inc.,* 277 F.3d 757, 768 (5th Cir. 2001)).

Plaintiff submits numerous accounts of injuries she sustained while employed at Pendleton. These include a injured finger, hypertension, back pain, knee pain, and hip pain. *See* Pls.'s Opp'n. to Mot. for Summ. J., p. 3-4. She alleges that these injuries limited her ability to lift or push heavy objects, that she sporadically had to walk with a cane, and that crutches had been recommended to her in November 2003 at approximately the same time she was terminated. *Id.; see also* Def.'s Mot. for Summ. J., Exhibit A, Pls's Dep.

There is no evidence of a request for FMLA leave that was denied except for that which was requested on November 11, 2003, the day of Plaintiff's termination. With respect to this request, Plaintiff contends that she faxed a handwritten note from her doctor to the Human Resources Office at Pendleton. Of course, if Plaintiff was fired before she requested the leave, it would be impossible for her to show the FMLA request caused her termination.

However, there is some dispute as to what time during the day she was fired. Allegedly, Plaintiff was called into a meeting with Deborah Skevington, Pendleton's Education Manager, and Kathleen Bertolino, Pendleton's Human Resources Manager, at approximately noon to discuss Plaintiff's job performance. *See* Defs.'s Ex. 14, Mot. Summ. J. (Rec.Doc.No. 22). Plaintiff then left work after this meeting having refused to turn in her resignation, where she apparently indicated to some colleagues that she thought she had been fired. *See* Pls.'s Dep., p. 153. When she came home, she telephoned her doctor, who faxed the request for medical leave to the Human Resources

Department.[2] *See* Pls.'s Dep., p. 146. She was later called at home by Bertolino, with Skevington listening over the speaker phone. Plaintiff was told that she had resigned, but again asserted that she had not, which prompted Bertolino to unequivocally terminate Plaintiff. *See* Pls.'s Dep., p. 263. During this conversation, Plaintiff also contends that she asked about her FMLA leave, and Bertolino responded by saying the "[doctor's] note did not count." *Id.*

While Plaintiff's Complaint suggests there was at least one more time she was inappropriately denied FMLA leave, such is not supported in her Opposition. Thus, the Court finds that there is only one potential FMLA violation that is viable in the instant proceeding, i.e. the denied request that occurred on November 11, 2003. To this allegation, Defendants respond that the request was made after termination, and neither had they held any previous potential FMLA qualifying absences against her.

The Court finds that Plaintiff cannot establish a *prima facie* case for an FMLA violation because she cannot show that her termination was because of or even related to the request for FMLA leave. Indeed, Plaintiff indicated that she thought she had been fired prior to making the request for medical leave, and there is no dispute as to whether her resignation was requested at the initial meeting. Moreover, at this meeting, the subjects discussed were complaints about Plaintiff's job performance. Although her supervisors were aware of Plaintiff's injuries prior to her termination, a request for FMLA must predicate recovery for improper denial of the request.

------

[2]   There are allegations suggesting that the request for FMLA leave came even earlier. However, as Defendants correctly note, these requests had to do with scheduling clinical appointments with Pendleton, and not with submitting a request for employee leave for health reasons. *See* Defs.'s Reply, p. 6-7 (Rec.Doc.No. 32).

C.    *ADA violation*

This Court has had previously noted:

> The term "disability" under the ADA includes: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. Merely having an impairment does not make one disabled for ADA purposes. To qualify as having an actual disability, a claimant must show that their impairment limits a major life activity. Major life activities include activities that are of central importance to daily life. Examples are walking, seeing, hearing, performing manual tasks, concentrating, learning, hearing, speaking, breathing, and working.
>
> The limitation on a major life activity must be substantial. The EEOC regulations define the term "substantially limits" as (i) unable to perform a major life activity that the average person in the general population can perform, or (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the average person in the general population. According to the EEOC, the following factors should be considered when determining whether an individual is substantially limited in performing a major life activity: 1) the nature and the severity of the impairment, 2) the duration or expected duration of the impairment, 3) the permanent or long term impact.
>
> [The Supreme Court] found that these terms need to be interpreted strictly to "create a demanding standard for qualifying as disabled. [The Supreme Court] limited the ADA analysis to include only those impairments that prevent or severely restrict an individual from doing activities that are of central importance to most people's daily lives. Accordingly, the ADA does not considered every impaired person to be disabled. The determination that an individual has a disability is made on a case by case basis and viewed in relation to how well an average person in the population can perform that activity. The court's focus is on the effect of the impairment on the life of the individual, rather than the diagnosis.

*See Lynch v. Lee*, 2004 WL 1900463, *2 (E.D. La. Aug. 18, 2004) (citations omitted).

Plaintiff indeed gives detailed accounts of her various injuries. These include an injury to her finger, hypertension, a hip injury, a back injury, complaints of limited mobility, impaired

strength, and the inability to sit stationary for extended periods of time. *See* Pls.'s Opp. Mot. Summ. J., p. 4-5 (Rec.Doc.No. 29).

The Court finds, however, that these injuries, neither individually or taken as a whole, amount to a substantial impairment of a major life activity such that Plaintiff would be entitled to employment protection under the ADA. Plaintiff admitted that these impairments did not affect her job performance, and that she was able to perform her job effectively. Pls. Dep.,  p. 207. Although Plaintiff contends that she had trouble walking, such limitation only manifested itself sporadically. Moreover, other limitations, including the injury to her finger and her inability to sit were only temporary impairments. While the Court does not want to characterize Plaintiff's suffering as insubstantial, it is notable that Plaintiff did not request for any specific accommodation, and it was her supervisor who provided her with a cane. *See* Pls.'s Dep., p. 274-280. Had her injuries risen to the threshold level of substantially impairing a major life activity or her ability to perform her employment duties, then recovery under the ADA may be possible so long as the other proof requirements are met. However, this is not the case here; thus, the Court finds that Plaintiff cannot raise a genuine issue of material fact as to the threshold requirement that she has a disability that substantially impairs a major life activity.

D.        Retaliation and Retaliatory Discharge

1.        Retaliation because of Sexual Harassment Complaints

To recover for retaliatory discharge, Plaintiff must show (1) that she participated in a statutorily-protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 684 (5th Cir.2001); *see also Cleveland v. Sam's West, Inc.,* 2005 WL 711612, *6 (E.D. La. Mar. 22, 2005) (Duval, J.).

Plaintiff contends that she was discharged because of her complaints of sexual harassment and because of her disability. Pendleton suggests that it terminated Plaintiff because of the following:

> [Plaintiff's] increasingly disruptive and/or improper interactions toward many other employees, including participants in the ACLS course; excessive absenteeism; a variety of errors, omission and inappropriate comments related to the ACLS program (for which she was responsible); failure to appear for an October 17 inservice program that she was supposed to lead; and an emerging pattern (sic) carelessness and failure to follow direction (sic)."

*See* Reply in Supp. Mot. Summ. J., p. 2-4 (Rec.Doc.No. 32).

Plaintiff indeed alleges that she complained of the harassment to Kathleen Bertolino, the Human Resources Manager who eventually fired her. For example, she claims that she told Bertolino about a sexually inappropriate comment made by Brady in August of 2002. *See* Exhibit 5, Defs.' Mot. Summ. J. (Rec.Doc.No. 22). As to other complaints of sexual harassment, Plaintiff also alleges that she informed Bertolino or other supervisors, but that evidence of the emails she sent were destroyed or were not available to her because they were Pendleton property. *See* Pl.'s Dep.,

p. 224; *see also* Opp. Mot. Summ. J., p. 3 (Rec.Doc.No. 29). These alleged emails were respectively sent at approximately the same time as the incidents occurred. *Id.*

Even if the complaints were not of the severe and pervasive nature required to recover in a sexual harassment claim, this would not preclude Plaintiff from recovering for retaliation of the complaints she reasonably perceived were examples of inappropriate sexual conduct. *Bice v. Lennox Indus., Inc.*, 2003 WL 21018638 (E.D.La. May 5, 2003) (Duval, J.). However, the Court finds that these allegations are not sufficient to raise a genuine issue of material fact as to whether Plaintiff's complaints of sexual harassment caused her to be fired. Plaintiff's retaliation claim fails because she cannot raise a genuine issue of material fact which would establish causation. *See Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984) (employee must prove there was a causal connection between the protected activity and the adverse employment decision; the connection required is causation-in-fact or "but for" causation). This is due in part to the fact that the complaints of the alleged illegal conduct occurred at best ten months before her termination.

Although the lapse of time between protected conduct and the retaliation is not *per se* conclusive of causation, the circumstances of this case suggest that Plaintiff cannot raise an inference that her employer fired because of her protected activity. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992) (the lapse of time as one of the elements in the entire calculation of whether Shirley had shown a causal connection between the protected activity and the subsequent firing); *see also Beckendorf v. Schwegmann Giant Super Markets*, 1997 WL 191504, at *5 (E.D.La. April 21, 1997). She does not specifically allege by way of affidavit or in her deposition when she notified her supervisors of Patrick Brady's illegal conduct, though presumably they could have been

as late February 2003.[3] Moreover, the intervening incidents of her absences,[4] poor job performance,[5] and lack of cooperation with other employees,[6] further dilutes the notion that but for her protected conduct she would not have been terminated. Thus, the Court finds that Plaintiff's retaliation claim does not raise a genuine issue of material fact such that a reasonable factfinder would conclude that she would not have been terminated but for her protected conduct.

### 2.      *Retaliation because of Disability Claims*

The Court finds that Plaintiff has not alleged facts sufficient to raise a genuine issue of material fact as to whether she was terminated because of her disability. As Defendant points out, Plaintiff only suggests with speculation that Pendleton fired her based on her disability because they did not want her to covered under their employee health program. *See* Pl.'s Dep., p. 167.

---

[2] Plaintiff was terminated in November 2003. She brings charges of sexual harassment that occurred as late as January 2003. She also claims she sent emails describing these incidences to her supervisors. She does not say when these emails were sent; however, the Court will assume for the purposes of this motion that they could have been sent as late as February 2003.

[4] On September 15, 2003, Debbie Skevington initiated a disciplinary action againt Plaintiff for her excessive absences. Specifically, Skevington affirms that Plaintiff had six unscheduled absences within the previous four month period. *See* Def.'s Mtn. Summ. J., Exhibit 8, ¶ 6 (Rec.Doc.No. 22).

[5] In early November 2003, Debbie Skevington and Kathleen Bertolino became aware of several errors with regard to a Advanced Cardiac Life Support course that Plaintiff was coordinating. Skevington also notes that several complaints by course participants were submitted to her.  *See* Def.'s Mtn. Summ. J., Exhibit 8, ¶ 7 (Rec.Doc.No. 22).

[6] On or about June 9, 2003, Loree Doyle, a supervisor of Plaintiff, prepared a disciplinary report concerning an incident involving Plaintiff's rude an inappropriate conduct towards two nurses at Pendleton. *See* Def.'s Mtn. Summ. J., Exhibit 9, ¶ 14 (Rec.Doc.No. 22).

### 3. *Retaliatory Conduct of Patrick Brady*

As for the retaliatory conduct of Brady, the U.S. Supreme Court recently held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* 126 S.Ct. 2405, 2415 (2006)(citations omitted).

The *Burlington* court adopted the Seventh and D.C. Circuits interpretation of adverse employment action and rejected the holdings of circuits such as this one, which employed an ultimate employment action standard, which only regards hiring, granting leave, discharging, promoting, and compensation as actionable under Title VII. *Id.* at 2410; *see also Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir. 1997). In this way, the scope of what is considered actionable in the Fifth Circuit has been expanded considerably.

Despite the expansion of what constitutes an adverse employment action in the retaliation context, the Court finds that the instant case does not provide the occasion to apply the expanded *Burlington* standard. The retaliatory conduct here involved horseplay, which stemmed from general personal animosity between Brady and Plaintiff, or at least, Brady directed towards Plaintiff.

### E. *Claims Against Patrick Brady*

The Court also finds that Plaintiff cannot maintain an action against Patrick Brady for individual liability under Title VII. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258 (5th Cir. 1999). Moreover, Plaintiff does not have a cognizable claim under the ADA or FMLA so the Court

dismisses these claims against Patrick Brady as well. Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment of Defendants, Pendleton

Memorial Methodist Hospital and Patrick Brady, is hereby **GRANTED** and Plaintiff's action is

hereby **DISMISSED WITH PREJUDICE**.


New Orleans, Louisiana, this   24th   day of October, 2006.


_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

19